CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 09 2019

JULIA C. DUDLEY, CLERK
BY: _Os Drake_
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| **MICHAEL ANTHONY DOBSON,** | ) | **CASE NO. 7:18-CV-00369** |
| Plaintiff | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **COLIN D. STOLLE, et al.,** | ) | By: Hon. Michael F. Urbanski |
| Defendants | ) | Chief United States District Judge |

## MEMORANDUM OPINION

Michael Anthony Dobson, currently incarcerated at Red Onion State Prison, complains that he is suffering an ongoing violation of his constitutional rights. Proceeding pro se, Dobson filed this lawsuit seeking relief via 42 U.S.C. § 1983. Defendants Scott Lang, Patricia Munley, and Colin D. Stolle (the Commonwealth defendants), filed a motion to dismiss on November 1, 2018. ECF No. 24. Defendants Bernard T. Booker, Tod Watson, and Philip White (the BCC defendants), filed a motion to dismiss on November 6, 2018. ECF No. 32. Defendant Derek M. Reed filed a motion to dismiss on November 29, 2018. ECF No. 41. Also pending is Dobson's motion to amend pleadings. ECF No. 50. The parties have fully briefed the issues.

For the reasons set forth below, Dobson's motion to amend is **GRANTED**; the motions to dismiss are **GRANTED**; and Dobson's federal causes of action are **DISMISSED**. The court to declines to exercise jurisdiction over Dobson's state law causes of action.

# BACKGROUND

## I. Factual Allegations

The following facts, which are taken from Dobson's complaint, the motions to dismiss, his response to the motions to dismiss, and the attached exhibits, are accepted as true for purposes of the defendants' motions.[1] Dobson is incarcerated in the Virginia Department of Corrections where he has served twenty-one years of a sixty-four year sentence for murder. The events about which he complains began in May 2017 when Dobson was housed at the Buckingham Correctional Center (BCC) in Dillwyn, Virginia.

Plaintiff has two stepsons, Marquel Leary and Dominique Leary. In July 2016, Marquel shot and killed a man in Virginia Beach. Dobson's wife, Marie, who is Marquel and Dominique's mother, has a history of mental illness. When it appeared that Marquel would be tried for murder, her mental health declined and Marie became convinced that the only way to save Marquel from going to prison was to hire someone to murder five people who were set to testify against him. Marie told Dobson about her plan and Dobson believed she was serious about hiring someone to commit murder on her behalf. In an effort to stop her, Dobson told Marie that he had a friend, Winston, who could find someone to carry out the murders. It was Dobson's hope that if he stepped in, Marie would come to her senses and change her mind about the plan.

---

[1] See Canady v. Hodges, No. 7:17CV00464, 2018 WL 3146792 (W.D. Va. 2018) (construing additional facts in pro se response as amendments to complaint) and Scates v. Doe, No. 6:15-2904-MFS-KFM, 2016 WL 8672963 (D.S.C. 2016) (noting that in evaluating a motion to dismiss, courts evaluate the complaint in its entirety, including documents that are integral to and relied on in the complaint when there is no question as to their authenticity).

When Marie learned that Marquel was facing a 30-year sentence, she pushed Dobson to come up with a plan. Dobson became alarmed and sought guidance from three mentors who worked at the prison. With the help of a prison minister, Dobson decided to contact an attorney in the Virginia Beach Commonwealth's Attorney's office.

The minister arranged a three-way call between himself, Dobson, and an attorney with the Commonwealth's Attorney's office. Dobson did not identify himself on the call, but told the attorney that someone was planning to kill the witnesses who were going to testify against Marquel. The next day, Dobson was called into the investigators' office at BCC and when asked, he admitted that he had made the call. He was reprimanded for making an unauthorized three-way call but the investigators then asked him if he would be willing to talk further with someone from the Commonwealth's Attorney's office. Dobson was upset that his identity was known and declined to talk further.

A few days later, Marie's mental health appeared to be worsening. Dobson became afraid that she was going to hire someone off the street to commit the murders and he felt like he had no choice but to call the Commonwealth's Attorney. On May 8, 2017, Dobson talked to his own attorney, who he had hired to seek a pardon on his behalf. She told him that what he was contemplating was dangerous and that if he went forward with his plan she would no longer be able to represent him.

On May 9, 2017 Dobson arranged to talk via telephone to defendant Patricia Munley, an investigator with the Commonwealth. Munley asked Dobson if he would meet with detectives, and Dobson agreed to do so. A few days later, Dobson met with three detectives, including defendant Sgt. Detective Derek M. Reed, who worked for the Virginia Beach Police

Department. Dobson told them that Marie believed that a man named Winston who lived in Maryland was setting up a plan for someone to commit the murders. The detectives wanted proof of the allegations, and Dobson agreed to correspond with Marie via email and to give copies of the emails to the detectives. The detectives also told Dobson that they wanted Reed to pretend to be the hitman and they discussed Reed playing the role "as if Winston didn't know he was really a cop[,] which would have kept [Dobson's] name out of it." ECF No. 1 at 15.

Dobson had a number of concerns. He did not want to be identified as having gone to the police with information and did not want to be connected to a case against Marie or Marquel. Both Marquel and his brother were associated with the "Bloods" gang and Dobson feared reprisal, both for himself, his father, his former wife, and his children. Dobson wanted assurance that he and his family would be kept safe. He also wanted the Commonwealth to assist him with his request for a pardon, because the attorney he hired would no longer represent him.

Defendant Munley was vague about how the Commonwealth would protect Dobson and his family, but urged him to trust them because they had experience in similar situations. Dobson did not see how the Commonwealth could use the "Winston plan" without Marie knowing that Dobson was involved, and he asked the Commonwealth to wait until he and his family could be placed in a witness protection plan. Munley told Dobson that they could not do that, but reassured him that his name would be kept out of the matter. Dobson was doubtful and asked Munley and Reed not to proceed until he could consult with his ex-wife. Munley told him they would be able to proceed with the investigation another way.

4

Conversations between Dobson, Munley, and Reed, and Dobson and his family, continued for several days.

> On May 25, 2017, defendant Reed sent Dobson the following email:

> Hey Mike,
> Yo I understand how you feel and we doing all we can. We not new to dealing with situations like this. We contacted the people we need to get your stuff rolling, and they working on that. I just need you to meet me halfway. So send me that number so we can get this thing done, and Commonwealth can do what they need to ASAP.
> Talk to you later.

ECF No. 48 at 6.

> On May 26, 2017, Reed emailed Dobson again, to discuss helping pay for calls

to Marie and to Reed. He also asked for the phone number to Marie's "burner" cell

phone she was using to set up the murder-for-hire.

> And Mike, I've tried to get things done with this and you not answering my question. I will try to send after I send this email. Yo I need that number because if not they are trying to do this some other way. I'll get that offender connect done now.

ECF No. 48 at 8. Dobson understood the language "if not, they are trying to do this

some other way" as a threat that they were going to make him turn over the number.

Id.

It is unclear whether Dobson provided the number to Reed. But the next day, while

Dobson believed that he was still in negotiations with the Commonwealth, he talked to Marie,

who told him that "Winston" had called and was in Virginia Beach getting a motel room.

Dobson was fearful and told Marie to stay home. He called Munley and told her that he did

not want them to proceed until some arrangement was made to protect his family. A short

time later, prison authorities summoned Dobson and defendant White told him that he was

being placed in the "hole"[2] for a "time out." Dobson was in the hole for four hours, and when he got out, he tried to call Marie, Munley, and Reed, but received no answer.

Two days later Dobson learned from Marie's mother that Marie had been arrested and was in jail. Dobson believed that his name had been kept out of the operation, but neither Reed nor Munley would return his calls. Approximately two months later, he learned from Marie's mother that it was known that he had assisted the police in arresting Marie because the information leading up to her arrest had been given to Marie's lawyer. When Dobson finally spoke to Munley, she told him that he should have known how the matter would end.

On August 4, 2017, Dobson received a letter sent from the Commonwealth, signed by defendant Lang, an Assistant Commonwealth's Attorney, and directed "To whom it may concern:" The letter stated that Dobson had helped the Commonwealth arrest Marie and charge her with five counts of solicitation of murder. The letter continued that Dobson helped save several lives and put his own life and that of his loved ones in danger, as follows:

> As a result of trial discovery obligations, Marie Leary is very much aware of the role Mr. Dobson played in her eventual arrest. As a result many of his personal relationships have been forever ruined. More importantly, he has now angered Marie Leary and her two currently incarcerated sons who have been convicted of numerous violent felonies and who have friends that reach far beyond the jail and prison walls.

> Mr. Dobson stepped forward and did the right thing and his direct actions resulted in the saving of lives. It is asked that he be given appropriate consideration in light of his heroic conduct.

ECF No. 1-1 at 33.

---

[2] The court presumes that the hole is a cell where an inmate is segregated from other prisoners and has no access to outside communication.

Dobson maintains that he did not give the Commonwealth permission to use his name and that Munley, Reed, and defendant Lang lied to him about keeping his identity secret and have since failed to protect him or his family. In addition, they told him they would help him try to secure a pardon and have not done so. He asserts that defendant Stolle, the Commonwealth's Attorney, either knew about or oversaw the sting operation and did nothing to stop it. ECF No. 48 at 2.

With the help of a prison staff member, Dobson filed an application for a pardon on his own behalf in December 2017. In support of his application, Dobson obtained letters from various members of the prison staff, including an intelligence officer, the principal of the education division, a member of the mental health department, a member of the correctional staff, a case management counselor, and the chairperson of the Whittley Art Gallery in Richmond, Virginia. All praise Dobson for his artistic talent and for his willingness to take on and complete tasks at BCC, such as painting murals, designing the BCC logo, teaching art to other inmates as part of a therapy group, illustrating a Relapse Prevention Plan workbook, and assisting the investigation office with various cases. It also was noted that Dobson read all the books in the prison library and started a literacy and reading program for his fellow offenders. Adjectives used to describe Dobson in the letters include "trustworthy," "mature," "enthusiastic," "confident," "passionate," "intelligent," "caring," "polite," "amiable," and "articulate." See letters, ECF No. 1-1 at 1-9.

After submitting his request for a pardon, Dobson was sure that he no longer was safe in general population. In January 2018 he asked to be placed in segregation and his request was granted. ECF No. 48-1 at 8-9. In March 2018 Dobson was told that he was going to be

placed back in general population and he objected, arguing that to do so would be putting his life in danger. ECF No. 48-1 at 9. He also wanted assurance that the Learys were on a list of inmates who were to be kept separate from him. Dobson was allowed to stay in segregation.

At another hearing held on April 3, 2018, prison officials told Dobson that he was being put in for a transfer. He wanted to stay at BCC in segregation so that he could complete additional work on his request for a pardon. He did not want to go into protective custody because he believed that it was too easy for someone to attack him in protective custody. He also did not think it was fair to have to live in hiding after he had done the right thing by exposing the murder-for-hire plan.

Dobson was not transferred, but in August 2018 he received a copy of the transfer order, where a prison official had recommended a transfer to "anywhere" and stated that Dobson's claim had been verified following an investigation. Also in August 2018, Dobson was told that he was going to be returned to general population and that he would be "charged and fined" if he refused to go. He did refuse to go and was charged, fined, and lost "points."

Dobson remained in segregation until April 2019, when he was moved to Red Onion State Prison. While in segregation, he spent most of his time locked in his cell and was no longer able to work, walk freely around the compound, watch television, or see his family. He lost income because he had worked as the art designer at BCC and also because he had a contract to illustrate covers for three children's books which he was not able to fulfill. Because they fear retaliation, Dobson's father has moved out of state and his ex-wife has moved from her home. His son and grandchild were threatened by a man who drove by and shot at them while yelling that Dobson was a dead man for snitching. ECF No. 46. Dobson also has taken

8

a new name. Stress from worrying about his own safety and that of his family has caused his hair to fall out. ECF No. 1-2.

Dobson now is incarcerated at Red Onion State Prison in PC and there are instructions to keep him separated from Marquel Leary. ECF No. 68 at 3-56. He claims that he is not safe at Red Onion State Prison because inmates circumvent the security policies and enter and exit the PC unit at will. He avers that inmates in protective custody have been assaulted by inmates not housed in the unit. In addition, he still fears for his family's safety.

## II. Causes of Action

Dobson makes the following claims: (1) The Commonwealth defendants and defendant Reed violated his Eighth Amendment right to be free of cruel and unusual punishment when they lied to him by telling him that his name would be kept out of the investigation of the murder-for-hire plot; (2) All defendants violated his rights under the Fourth, Eighth, and Fourteenth Amendments when they placed him in the hole to keep him from contacting his wife prior to her being arrested; (3) The BCC defendants have violated his Eighth Amendment right by placing him segregation or protective custody because he does not have access to television, cannot walk around freely, and cannot work; and (4) His rights under the Virginia Crime Victim and Witness Rights Act have been violated by the Commonwealth defendants.[3]

Dobson is proceeding pro se and his pleadings are liberally construed. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520-521 (1972). A liberal

---

[3] Dobson also states without explanation or elaboration that his rights under the Eleventh Amendment were violated. ECF No. 1 at 4. The Eleventh Amendment does not provide rights to individuals and Dobson can bring no claim based on the Eleventh Amendment.

reading of Dobson's complaint, combined with his responses to the motions to dismiss, indicates that he intended to plead a substantive due process claim against the Commonwealth defendants based on their promises to keep his identity confidential and the subsequent identification of him as an informant in the murder-for-hire plan.[4]

Dobson seeks damages in the amount of $250 million and asks to be allowed to stay in segregation where he is safe, but with all the privileges of inmates in general population. He also asks that his new name be kept from public disclosure. In the alternative, Dobson asks to be transferred to a facility in New Hampshire, Vermont, or Maine.

In their motions to dismiss, the BCC defendants argue that Dobson has failed to state a claim that they violated his Eighth Amendment rights in any way. They claim that he did not suffer deprivation of a basic human need or suffer physical or emotional injury when he was placed in either short or long-term segregation.

The Commonwealth defendants also argue that Dobson has not stated a constitutional claim, and that they are entitled to Eleventh Amendment immunity as well as prosecutorial immunity. In addition, Commonwealth defendant Reed asserts that Dobson has not stated a claim to relief because he has no constitutional right to not be lied to by government officials or to have government officials refrain from using the "Winston plan" without his permission. Finally, Reed asserts that Dobson's claim fails because he has not suffered actual harm other than his subjective fear of being in danger.

---

[4] In various responses to the motions to dismiss, Dobson asserts a cause of action under the Fourteenth Amendment. See ECF Nos. 56 at 1, 58 at 4, 61 at 2.

## DISCUSSION

### I. Motion to Amend

On December 12, 2018 Dobson filed a motion to amend in which he stated that it was his intent to state a claim that his Eighth Amendment right to be free of cruel and unusual punishment was violated by defendants' actions. ECF No. 50. The Commonwealth defendants object to the motion to amend as futile, asserting that Dobson still fails to state a claim for relief under the Eighth Amendment. ECF No. 52.

Under Federal Rule of Civil Procedure 15(a)(2), the court should freely give leave to amend when justice so requires. Dobson is proceeding pro se and his pleadings are to be liberally construed. Erickson, 551 U.S. at 94; Haines v. Kerner, 404 U.S. at 520-521. The motion to amend appears to present additional evidence and argument to support Dobson's original claim and granting it will not prejudice the defendants. Accordingly, the motion to amend is **GRANTED**.

### II. Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual allegations, which, if accepted as true, "'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007)). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." Twombly, 550 U.S. at 555. This plausibility standard requires a plaintiff to demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

When ruling on a motion to dismiss, the court accepts "the well-pled allegations of the complaint as true" and "construe[s] the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). While the court must accept as true all well-pleaded factual allegations, the same is not true for legal conclusions. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. A court need not accept as true "'legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement, . . . unwarranted inferences, unreasonable conclusions, or arguments.'" Richardson v. Shapiro, 751 Fed. Appx. 346 (4th Cir. 2018) (quoting Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009)) (internal quotation marks omitted). Thus, a complaint must present sufficient nonconclusory factual allegations to support a reasonable inference that the plaintiff is entitled to relief and the defendant is liable for the unlawful act or omission alleged. See Francis v. Giacomelli, 588 F.3d 186, 196-197 (4th Cir. 2009) (affirming dismissal of claim that simply stated a legal conclusion with no facts supporting the allegation) and King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) ("Bare legal conclusions 'are not entitled to the assumption of truth' and are insufficient to state a claim.") (quoting Iqbal, 556 U.S. at 679).

## III. BCC Defendants

The BCC defendants assert that Dobson has failed to state a claim against them because he has failed to allege that any of them were personally involved in the deprivation of any of his rights. The BCC defendants are correct.

### A. Liability under 42 U.S.C. § 1983

To prevail on a claim for a civil rights violation under 42 U.S.C. § 1983, a plaintiff must establish (1) that he has been deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States and (2) that the conduct about which he complains was committed by a person acting under color of state law. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 658 (4th Cir. 1998). Plaintiffs may seek money damages against defendants for their official actions when they are sued in their individual capacities, subject to some exceptions and immunities. Hafer v. Melo, 502 U.S. 21, 30-31 (2001)

Claims for money damages brought against defendants in their official capacities are not cognizable in § 1983 lawsuits because neither a state nor its officials acting in their official capacities are persons for purposes of § 1983. Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Thus, a claim brought against an official in his or her official capacity is not considered a suit against the official, but rather a suit against the official's office. Because the Eleventh Amendment prohibits courts from entertaining an action against the state, Alabama v. Pugh, 438 U.S. 781, 782 (1978), it also prohibits courts from considering claims against defendants in their official capacities. Cromer v. Brown, 88 F.3d 1315, 1332 (4th Cir. 1996).

However, a plaintiff may seek prospective injunctive relief against state defendants in their official capacities. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989); Graham v. Kentucky, 473 U.S. 159, 167 n. 14 (1985). "To ensure enforcement of federal law . . . the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law." Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004).

## B. Failure to Protect

The Eighth Amendment imposes a duty on prison officials to "protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). To establish a §1983 claim for failure to protect an inmate from violence, the inmate must show: (1) that the deprivation alleged is sufficiently serious and resulted in a denial of the minimal civilized measure of life's necessities and (2) that the prison official had a sufficiently culpable state of mind. Id. at 834 (internal quotation marks omitted). A "sufficiently culpable state of mind" means that a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837.

A showing of negligence is not sufficient. Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999). Thus, an official's failure to alleviate a significant risk that he should have perceived but did not, does not describe an Eighth Amendment claim. Farmer, 511 U.S. at 838. Stated differently, prison officials are not liable if they "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent. Id. at 844; see Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (stating that it was insufficient to show that a defendant "should have" recognized a substantial risk of harm).

Dobson alleges that on the night his wife was arrested, defendant White agreed to put Dobson in the hole for several hours so that he could not contact his wife to tell her about her imminent arrest. Watson and Booker authorized his placement in the hole.

Dobson does not allege that he was physically harmed, or denied food, medical care, or any other necessity. It appears that he simply was not allowed to communicate with Marie

for several hours. Being placed in segregation, even long-term, does not rise to the level of an Eighth Amendment violation. <u>In re Long Term Administrative Segregation of Inmates Designated as Five Percenters</u>, 174 F.3d 464, 466-67 (4th Cir. 1999). The court understands that Dobson is alleging that placement in the hole kept him from warning Marie about execution of the plan to arrest her which triggered the situation where he now fears reprisal from Marquel's friends and family. Nevertheless, it is clear under Eighth Amendment jurisprudence that he has failed to allege a violation of his constitutional rights by the BCC defendants based on these facts.

Dobson also argues that his placement first in segregation and now in protective custody violates the Eighth Amendment because he does not have access to television, cannot walk around freely, and cannot work. However, as discussed above, placement in long-term segregation does not violate the Eighth Amendment as long as an inmate receives "'adequate food, clothing, shelter, and medical care.'" <u>Five Percenters</u>, 174 F.3d at 472 (quoting <u>Farmer</u>, 511 U.S. at 832). Receiving only five hours of exercise a week, and not being allowed to participate in work, school, or study programs are restrictive measures, but do not constitute cruel and unusual punishment. <u>Id.</u> at 471. Moreover, Dobson requested placement in segregation because he did not believe he would be safe in the general population. Based on the foregoing, the court finds that the BCC defendants have not violated Dobson's Eighth Amendment rights by placing him in segregation or protective custody.

### C. Fourteenth Amendment--Procedural Due Process

Dobson also argues that placement in the hole violated his right to procedural due process under the Fourteenth Amendment. He claims that placement in the hole put his life

in danger and that doing so without a court order violated his rights. However, it is well-established that an inmate does not have a liberty interest in remaining in general population. Sandin v. Conner, 515 U.S. 472, 483-484 (1995). Liberty interests protected by the Due Process Clause generally are "limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. Placement in segregated confinement "does not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." Id. at 486. Accordingly, it was not a denial of due process to place Dobson in the hole without a court order.

### D. Fourth Amendment

Dobson also argues that the BCC defendants violated his Fourth Amendment right to be free from search and seizure because he was detained without a warrant. The Fourth Amendment guards against unreasonable searches and seizures and applies to lawfully incarcerated inmates, although their privacy interests are much more limited than those of people who are not incarcerated. Bell v. Wolfish, 441 U.S. 520, 545-546 (1979). Dobson has submitted no authority and none was found for the proposition that prison officials must obtain a warrant before placing an inmate in segregation. Use of administrative segregation is discretionary with prison officials, absent explicit language in state law limiting or prohibiting the use of administrative segregation. Keeler v. Pea, 782 F.Supp. 42, 44 (D.S.C. 1992). In addition, Dobson believes he was placed in the hole so that he could not call his wife, but there is no constitutional right to make phone calls in prison. United States v. Alkire, 82 F.3d

411 (4th Cir. 1996) (Table); <u>Bratcher v. Hampton Roads Regional Jail</u>, No. 1:16cv244, 2018 WL 1037052 at *7 (E.D. Va. 2018). Nor did Dobson have a right to stop the criminal investigation of the murder-for-hire plot. <u>See</u> <u>Linda R.S. v. Richard D.</u>, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.")

Dobson has failed to state a claim against defendants White, Watson, or Booker under the Fourth, the Eighth, or Fourteenth Amendments. Accordingly, their motion to dismiss is **GRANTED** and all claims against the BCC defendants are **DISMISSED**.

## IV. The Commonwealth Defendants and Defendant Reed

Dobson asserts that the Commonwealth defendants violated his Eighth Amendment right to be free of cruel and unusual punishment. Defendants Stolle, Lang, and Munley assert that Dobson has not stated a claim for relief because they were compelled by state law to disclose his identity to Marie's attorney. The Commonwealth defendants also assert that they are entitled to Eleventh Amendment immunity and prosecutorial immunity.

Defendant Reed asserts that Dobson has failed to state a claim against him because he neither administered punishment to Dobson nor was responsible for Dobson's care and safety. In addition, Reed contends that Dobson has not suffered actual harm, but alleges only a subjective fear of being in danger.

### A. Eighth Amendment Claim

As a general rule, the Eighth Amendment applies to prisoners and protects them from harm at the hands of prison officials. In this case, Dobson is a prisoner but the Commonwealth

defendants are not prison officials, so it is not clear that the Eighth Amendment applies to his situation.

Courts looking at claims brought by incarcerated persons for protection afforded informants who assist law enforcement have analyzed the claims under the Eighth Amendment, while courts looking at claims brought by non-incarcerated plaintiffs have analyzed the claims under the Fourteenth Amendment. Compare, e.g., Jordan v. Hooks, No. 6:13-cv-2247, 2015 WL 5785504 (D.S.C. 2015) with G-69 v. Degnan, 745 F.Supp. 245, 262-263 (D.N.J. 1990). No cases were found where an inmate was suing state actors who were not prison officials for similar claims.

In this case, it is unclear whether Dobson can bring an Eighth Amendment claim against non-prison officials. However, it is clear that he has a right to personal security which is an "historic liberty interest" protected substantively by the Due Process Clause and not extinguished by confinement. Youngberg v. Romeo, 457 U.S. 307, 315 (1982) (citing Ingraham v. Wright, 430 U.S. 651, 673 (1977) and Hutton v. Finney, 437 U.S. 678 (1978)). In Youngberg, the Supreme Court found that an involuntarily committed mental patient could not bring an Eighth Amendment claim for alleged mistreatment because he was not incarcerated, but could raise a substantive due process claim under the Fourteenth Amendment.

The court finds that Dobson is in an analogous situation, where he is not suing prison officials, but is suing state officials over issues related to his personal security. Thus, his claims against the Commonwealth defendants and defendant Reed will be analyzed under the Fourteenth Amendment and his claims under the Eighth Amendment will be **DISMISSED**. In addition, any claims brought by Dobson against the Commonwealth defendants and Reed

for violation of his rights related to placement in the hole, or in segregation, are **DISMISSED** for the same reasons the claims against the BCC defendants are dismissed.

### B. Fourteenth Amendment--Substantive Due Process

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." Daniels v. Williams, 474 U.S. 327, 331 (1986) (emphasis in original). The touchstone of due process is protection of the individual against arbitrary action of the government, whether the fault lies in a denial of procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective. County of Sacramento v. Lewis, 523 U.S. 833, 845-846 (1998) (internal quotations and citations omitted).

Cases dealing with abusive executive action emphasize that only the most egregious official conduct can be said to be "'arbitrary in the constitutional sense.'" Id. at 846 (quoting Collins v. Harker Heights, 503 U.S. 115, 129 (1992)). "[T]he Due Process Clause was intended to prevent government officials from abusing their power or employing it as an instrument of oppression." Id. (internal citations and quotations omitted). The Due Process Clause protects individuals against government action that "shocks the conscience," Rochin v. California, 342 U.S. 165, 172 (1952), or interferes with rights "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325-326 (1937).

"[N]othing in the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney v. Winnebago

County Dept. of Social Services, 489 U.S. 189, 195 (1989). The purpose of the clause is to "protect the people from the State, not to ensure that the State protect[s] them from each other." Id. Nevertheless, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 199-200 (citing Youngberg, 457 U.S. at 317).

> The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. . . . The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

Id. at 200 (internal citations omitted). Liability under these circumstances is predicated on the special relationship between the state and the individual. Kneipp v. Tedder, 95 F.3d 1199, 1204-1205 (3rd Cir. 1996).

Courts also have concluded that liability exists when the state affirmatively places a person in a position of danger he would not have otherwise faced. Monfils v. Taylor, 165 F.3d 511, 516 (7th Cir. 1998). The Fourth Circuit recognizes the state-created danger doctrine, noting that "'[w]hen the state itself creates the dangerous situation that resulted in a victim's injury, the absence of a custodial relationship may not be dispositive. In such instances, the state is not merely accused of a failure to act; it becomes much more akin to an actor itself directly causing harm to the injured party.'" Robinson v. Loi, 536 Fed. Appx. 340, 343 (4th Cir. 2013) (quoting Pinder v. Johnson, 54 F.3d 1169, 1177 (4th Cir. 1995) (en banc)). The

state-created danger doctrine is narrow and for it to apply, there must be affirmative action, rather than inaction, on the part of the State that creates or increases the risk that the plaintiff will be harmed by a private actor. Id. at 343-344.

A review of cases illustrates the circumstances in which plaintiffs have stated claims for violations of their substantive due process rights, under both the special relationship theory and the state-created danger theory. In Monfils, an informant was murdered by his co-workers after a police officer released a tape of a tip he called in that a fellow employee was going to steal an electrical cord when he left work. The police contacted the workplace and the thief was detained by in-house security and suspended for five days when he would not allow his bag to be searched. Monfils, 165 F.3d at 513.

Furious, the thief called the police station, seeking information about who had reported him, and a police officer provided a copy of the recording to him. The thief recognized the voice, and with the help of other coworkers, murdered the informant. The release of the tape occurred after promises were made by other members of the police department to the informant that the information would not be released, and also after the officer assured the assistant district attorney that the officer would make sure the tape would not be released but then did not follow through. Id. at 514-515.

The issue before the court was whether the officer responsible for releasing the recording was entitled to qualified immunity. The court determined that he was not, stating "[The officer] clearly created a danger and, by assuring [the assistant district attorney] that he would make sure the tape was not released but not following through, he created a danger [the informant] would not otherwise have faced." Id. at 518.

In <u>Jordan</u>, 2015 WL 5785504,[5] the court denied summary judgment to a prison guard who allegedly told other inmates that the plaintiff was a "snitch," which resulted in the plaintiff being attacked three times by other inmates. <u>Id.</u> at *1. "As the Fourth Circuit has observed, '[i]t is impossible to minimize the possible consequences to a prisoner of being labeled a 'snitch.'" <u>Id.</u> at *3 (quoting <u>Miller v. Leathers</u>, 913 F.2d 1085, 1088 n. 1 (4th Cir. 1990) and collecting cases). In addition, the court noted that an inmate can bring a claim to challenge harm "that is certain or very likely in the future, even if the harm has not yet materialized." <u>Id.</u> (citing <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993) and <u>Woodhous v. Com. of Va.</u>, 487 F.2d 889, 890 (4th Cir. 1973)).

In <u>G-69 v. Degnan</u>, 745 F.Supp. 245 (D.N.J. 1990), a confidential informant brought an action for injunctive relief against former state Attorneys General and other state officials for their failure to honor an agreement to relocate and provide a new identity for him after his identity was disclosed. The court dismissed claims for money damages as barred by the Eleventh Amendment, but allowed a claim for prospective injunctive relief against two of the defendants. <u>Id.</u> at 266. The court found that the plaintiff was in a "special relationship" with the state where both parties anticipated that the informant's activities, if discovered, could result in a threat to the life of the informant. <u>Id.</u> at 265.

> It is difficult to imagine that a person would enlist for such a dangerous position absent some guarantee of personal safety. Having made such a guarantee, when there is so clear a risk to an individual's life and liberty, the state may not, consistent with the Constitution, walk away from the bargain.

---

[5] Jordan, who was incarcerated, brought his claim under the Eighth Amendment, but the analysis is essentially the same as claims brought under the Due Process Clause of the Fourteenth Amendment. <u>See</u> <u>Lewis</u>, 523 U.S. 833 at 849-850 (finding that deliberate indifference standard under Eighth Amendment must also be enough to satisfy fault requirement for due process claims based on medical needs of pre-trial detainee) and <u>DeShaney</u>, 489 U.S. at 199 n. 5 (suggesting that Eighth Amendment "deliberate indifference" standard applies in substantive due process claim).

22

Id. at 265.

See also McIntyre v. United States, 336 F.Supp.2d 87, 109 (D. Mass. 2004) (applying state-created-danger analysis to find allegation that FBI agent revealed to known murderers that one of their associates was an informant cooperating with the government stated a claim for violation substantive due process rights) and Kallstrom v. City of Columbus, 136 F.3d 1055, 1067 (6th Cir. 1998) (applying state-created-danger theory to find that city's release of undercover officers' personal information to violent gang members created a constitutionally cognizable "special danger" giving rise to § 1983 liability).

Where courts have found that public officials were not liable for releasing identities or information, it was in circumstances in which law enforcement authorities did not exercise sufficient control over the informant to give rise to a constitutional duty to protect. In Piechowicz v. United States, 885 F.2d 1207, 1215 (1989), the court found that federal agents did not have an obligation under the Due Process Clause to protect witnesses in a criminal trial who testified under subpoena and subsequently were murdered because the witnesses were not in the custody of a federal agency. In Williamson v. City of Virginia Beach, Va., 786 F.Supp. 1238 (E.D. Va. 1992), the court found that a police department was not liable for the death of a juvenile informant when he committed suicide at home after he voluntarily provided information to police about illegal drug transactions and then became fearful of reprisal. The court concluded that because his participation was voluntary and because he was at home where he could and did seek counsel of his family members, that his situation was not sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Id. at 1254.

The court finds that Dobson's factual allegations are insufficient to state a claim for a Fourteenth Amendment substantive due process violation. Dobson contacted the Commonwealth's Attorney's office voluntarily and once the wheels began turning, the Commonwealth had a duty to continue the investigation and make the arrests. Since Dobson's identity has become known, he has been housed either in segregation or protective custody and has not been harmed. In addition, the Commonwealth's Attorney's office has written a letter for Dobson, describing the help he gave the Commonwealth, to support Dobson's request for a pardon.

This is not a case like Jordan, where a guard told other inmates that the plaintiff was a "snitch," resulting in the plaintiff being attacked, or like Monfils, where the defendants released information about the informant but took no action to protect him. This case also is distinguishable from Degnan, where the defendants failed to maintain their end of a bargain to protect the plaintiff. Here, the Commonwealth defendants have done what they have the power to do to protect Dobson, which is write the letter to assist him with his request for a pardon.

Because Dobson is incarcerated, it is unclear what further action the Commonwealth defendants could take to protect him, making this case more like Piechowicz and Williamson, where courts found that law enforcement officers did not have a duty to protect individuals who were not in their custody. Moreover, Dobson has cited to no authority and none was found, by which the Commonwealth defendants could seek to transfer Dobson to another facility, or another state prison system, as he has requested. See Miller v. Landon, 545 F.Supp.81, 82 (W.D. Va. 1982) (finding that transfer of an inmate is within the discretion of

24

the director of the VDOC, taking into consideration space available, transportation required, and the categories within the prison system) and Peterson v. Davis, 421 F.Supp. 1220, 1221 (E.D. Va. 1976) (holding that inmate has no reasonable expectation of being assigned to a particular prison).

In addition, although Dobson enjoyed a relatively high level of privileges prior to being placed in administrative segregation and later being moved to protective custody at Red Onion State Prison, he has no liberty interest in the continuation of the privileges and the loss of privileges raises neither procedural nor substantive due process concerns. See Sandin, 515 U.S. at 483-484 (liberty interests protected by Due Process Clause are "limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life") and Allah v. Burt, No. 4:08-1538-TLW-TER, 2010 WL 476016 (D.S.C. 2010) ("There is no constitutional right for a state prisoner or federal prisoner to be housed in a particular institution, at a particular custody level, or in a particular portion or unit of a correctional institution."). Because Reed and the Commonwealth defendants have done what they have the authority to do to protect Dobson, he has failed to state a claim against them for violation of his substantive due process rights.

Also, to the extent Dobson is asking the court to grant relief that will protect his family members, his claim is not cognizeable. First, Dobson, as a pro se litigant and a non-attorney, may not sue on behalf of anyone else. Murray v. Singhi, No. 0:09-451-PMD-PJG, 2009 WL 2447987, at *3 (D.S.C. 2009) (citing 28 U.S.C. § 1654; Warth v. Seldin, 422 U.S. 490, 499

(1975); and <u>Estate of Kerner v. United States</u>, 895 F.2d 1195, 1162 n. 3 (7th Cir. 1990)). Second, Dobson lacks standing to assert the rights of others. Article III of the Constitution requires that a plaintiff must allege a distinct and palpable injury to himself, even if it is an injury shared by other possible litigants. <u>Warth</u>, 422 U.S. at 500. Accordingly, Dobson cannot state a claim for relief for harm suffered by anyone other than himself.

### C. State Law Causes of Action

Dobson has alleged violation of his rights under Crime Victim and Witness Rights Act, Va. Code § 19.2-11.01, and also has asserted claims for negligence, false imprisonment, and intentional infliction of emotional distress. ECF Nos. 70, 73, 74, 75. The Commonwealth defendants and defendant Reed responded to these claims. ECF Nos. 71, 72. This court declines to exercise supplemental jurisdiction over Dobson's state law claims and they are **DISMISSED** without prejudice pursuant to 28 U.S.C. § 1367(c).

### CONCLUSION

The court acknowledges that Dobson provided assistance to the Virginia Commonwealth's Attorney's office which resulted in the foiling of a plan to murder five people. The court further acknowledges that as a result of providing the assistance, Dobson's ex-wife and her son were prosecuted and found guilty and may be intent on seeking revenge. Nevertheless, as discussed above, the court concludes that Dobson has failed to state a claim that his constitutional rights have been violated by any actions taken or not taken by any of the defendants. The BCC defendants have kept Dobson from harm by placing him in administrative segregation and protective custody, and Reed and the Commonwealth defendants have taken the actions that are available to them to assist Dobson.

Accordingly, the motion to dismiss filed by defendants Scott Lang, Patricia Munley, and Colin D. Stolle, ECF No. 24, is **GRANTED** and the claims against them are **DISMISSED**; the motion to dismiss filed by defendants Bernard T. Booker, Tod Watson, and Philip White, ECF No. 32, is **GRANTED** and the claims against them are **DISMISSED**; the motion to dismiss filed by defendant Derek M. Reed, ECF No. 41, is **GRANTED** and the claims against him are **DISMISSED**. Dobson's motion to amend pleadings, ECF No. 50, is **GRANTED**. Any state law claims raised by Dobson are **DISMISSED** without prejudice.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to Dobson and to counsel of record for defendants.

An appropriate order will be entered.

It is so **ORDERED**.

ENTERED: 07-09-2019

/s/ Michael F. Urbanski

    Michael F. Urbanski
    Chief United States District Judge